# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | NO. 10-CR-00319-11 |
| | * | NO. 16-CV-01273 |
| VERSUS | * | |
| | * | JUDGE HICKS |
| BRIAN MUSOMBA MAWEU | * | MAGISTRATE JUDGE HORNSBY |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

NOW INTO COURT, through the undersigned Assistant United States Attorney, comes the United States of America, who files this response to the defendant's motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255, and in support of which would respectfully show the Court as follows:

## I.

## CRIMINAL CONDUCT[1]

*Dreamboard*

This prosecution concerned Brian Musomba Maweu's involvement in Dreamboard, an Internet-based, members-only bulletin board designed to

---

[1] This factual summary derives from the Pre-Sentence Investigation Report, the factual stipulation offered in connection with the defendant's guilty plea, uncontested factual assertions included in the United States' Sentencing Memorandum, and attachments to the United States' Sentencing Memorandum that were admitted by the district court at the sentencing hearing. The sentencing memorandum and attachments appear in the sealed portion of the district court record. The sealed PSR, which is designated as Record Document 833, is referred to in this response using the designation "PSR, ¶ ___," or "PSR, p. ___."

facilitate the distribution of child pornography among its members. Dreamboard was created in January of 2008 by an individual known only as "Hawkeye"; thereafter, membership in the bulletin board was strictly regulated by its administrators.  [Rec. Doc. 824-2, pp. 1-2; PSR, ¶¶ 9, 10].

Dreamboard featured five distinct levels of membership, and each carried with it the right to access different categories of content posted on the board.  The highest level was "administrator;" those individuals, including Hawkeye and a few others, had access to all the pornographic material stored on the board.  The next highest membership level was the "Super VIP." level.[2]  That level included those members who posted child pornography they had produced themselves.  Super VIP. members had access to all the material posted on the bulletin board, and they had exclusive access to material posted in a special Super VIP. section.  The remaining three categories of membership were "Super VIP," "VIP," and simply "Members."  As of June of 2010, there were approximately 590 validated members of Dreamboard.  Four members were "administrators," 6 were classified as Super VIP. members, 65 were

---

[2] Note that the period after "VIP" was part of the name of that membership level. [Rec. Doc. 824-3, p. 3; PSR, ¶ 13].

Super VIP members, 150 were VIP members, and 365 were Members. [Rec. Doc. 824-2, pp. 2-3; PSR, ¶¶ 11, 13, 14].

Once accepted, members were required to regularly post new pornographic material on the board. Members could be moved into higher or lower membership levels by an administrator depending on the quantity and content of the images of child pornography they posted. If a member failed to post new child pornography to the bulletin board, his membership would be cancelled. During the operation of the enterprise, each member posted at least three images of children engaged in sexually explicit conduct. [Rec. Doc. 824-2, p. 2; PSR, ¶ 11].

### Maweu's Role in the Enterprise

Maweu, a citizen of Kenya, joined Dreamboard on January 18, 2009, using the screen name "Catfish." He was one of only 590 members who were eventually elevated to "Super VIP." status. During the time he was a member of the bulletin board, he posted not less than 121 images or files, 34 of which were posted to a restricted section of the board devoted exclusively to "homemade" material. On that section of the board, Maweu posted images he had produced by recording himself sexually abusing various Kenyan children. [Rec. Doc. 824-2, p. 4; PSR, ¶¶ 16].

In addition to posting original, homemade pornographic material on Dreamboard, Maweu also paid the fees required by an Internet hosting

3

company to maintain the bulletin board website on the Internet.  In this way, he supported and facilitated the operation of the entire board.  [Rec. Doc. 831].

In furtherance of the objectives of the enterprise, Maweu made the following postings, among numerous others, to the Dreamboard bulletin board:

- On or around June 25, 2009, an advertisement offering to distribute a file entitled *Rain.FLV*, which contained child pornography;

- On or around July 30, 2009, an advertisement offering to distribute a file entitled *chakacha.rar*, which contained child pornography; and,

- On or around December 31, 2009, an advertisement offering to distribute a file entitled *ruffian.avi*, which contained child pornography.

[Rec. Doc. 824-2, pp. 3-4; PSR, ¶ 16].

During all relevant times, Edward Oedewaldt, also known as "twelvish" and "Legend," was a member of the Dreamboard enterprise.  Oedewaldt lived and conducted various activities in support of the enterprise in Arcadia, Louisiana, which is located in the Western District of Louisiana.   [Rec. Doc. 824-2, pp. 3-4; PSR, ¶ 15].

***Other Child Exploitation Activities: "My African Girls" and "The Goldberg Series"***

In addition to his activities related to Dreamboard, Maweu administered a separate online bulletin board website called "My African Girls."  That website offered for sale various images and videos Maweu had produced, all of

which depicted him molesting Kenyan children.  Patrons of that bulletin board, in addition to purchasing the images and videos Maweu had in stock, could contract for the production of custom videos featuring specified girls engaged in specified sex acts.[3]  [PSR, ¶¶ 402].

One particular series of popular images and videos produced and sold by Maweu is commonly known as "the Goldberg series."  Those high-quality videos feature Maweu sexually molesting several different children between the ages of 6 and 12 years.  That series includes at least 55 different videos.[4] [Rec. Doc. 831, p. 4].

## II.

## RELEVANT PROCEDURAL HISTORY

On November, 9, 2011, Maweu was charged in a fourth Superseding Indictment with one count of engaging in a child exploitation enterprise, in

---

[3] At the sentencing hearing, the district court admitted copies of web-based exchanges between Maweu and some of his subscribers on the "My African Girls" bulletin board. In several messages, members inquired about purchasing videos of particular girls, referring to them using physical descriptions.  In one such message, a patron asked Maweu if he would consider "giv[ing] them all some sort of names so we dont [sic] have to refer to them as thin, fat, bigbutt girl etc."  This familiarity with the subjects of the videos suggests Maweu maintained access to a group of girls he victimized repeatedly to produce the materials he sold.  Notably, many of the messages referenced "db" and "Hawkeye," suggesting there was some overlap between members of the "My African Girls" bulletin board and Dreamboard. [Rec. Doc. 831-1].

[4] Maweu's production of the Goldberg Series was confirmed by an investigation of the Bundeskriminalamt (BKA) Central Child Pornography Unit, a German agency that investigates child pornography offenses.  That unit's report on Maweu was admitted at the sentencing hearing.  [Rec. Doc. 831-2, Rec. Doc. 836].

violation of 18 U.S.C. § 2252A(g) (Count 1); one count of conspiracy to advertise the distribution of child pornography, in violation of 18 U.S.C. §§ 2251(d)(1) and (e) (Count 2); one count of conspiracy to distribute child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1); and one count of forfeiture, pursuant to 18 U.S.C. § 2253(a)(3) (Count 5).  [Rec. Doc. 506].  Maweu, who was living in Kenya at the time of his indictment, consented to extradition to the United States to face these charges.[5]  [Gov. Exh. 2].

On April 9, 2015, Maweu pleaded guilty to Count 1 of the Indictment. [Rec. Doc. 822].  During the plea colloquy, the district court personally addressed the defendant and confirmed his understanding of the charge to which he was pleading guilty.  The Court also confirmed that defense counsel believed, based on his interactions with Maweu, that Maweu understood the nature of the charge to which he was pleading guilty.   Specifically, counsel noted that Maweu is "a very intelligent, reflective individual, . . ." and counsel

---

[5] Though it is Maweu's burden as movant to substantiate his claim with reliable evidence, *see* discussion *infra* at pp. 40-41, he did not attach to his § 2255 motion any documents related to his extradition proceedings.  No documents related to those proceedings appear in the district court record either.  To assist the Court in the event it regards those proceedings as relevant to the instant motion, the United States has obtained copies of available documents through the U.S. Department of Justice's Office of International Affairs ("OIA"), the DOJ component that communicates with foreign authorities and coordinates extradition requests.  *See* Gov. Exh. 1 (U.S. extradition request); Gov. Exh. 2 (Kenyan order).

had "no reason to doubt that he completely understands the charges against him." [Rec. Doc. 861, pp. 5-6].  The district court also specifically addressed the defendant regarding the factual stipulation offered in connection with his guilty plea; Maweu acknowledged the stipulation was correct. [Rec. Doc. 861, pp. 7-10].

Regarding Maweu's access to counsel to connection with his guilty plea, Maweu confirmed that he had met with him on several occasions.  He further stated that he was satisfied with counsel's representation of him.  [Rec. Doc. 861, p. 12-13].

When the Court asked Maweu if anyone had "forced [him] to plead guilty," Maweu replied in the negative, stating that he was "just accepting responsibility."  He also specifically denied being tricked into pleading guilty, or pleading guilty because someone told him "there would be more charges filed against [him]," or "some other action taken against [him]."  He confirmed he had decided to plead guilty, with the assistance of counsel, because "[n]ow that [he saw] the law," he was in fact guilty.  [Rec. Doc. 861, pp. 22-23].  Maweu also confirmed his understanding of the plea agreement, that the plea agreement set forth the entirety of the agreement between the parties, and that there were "no side agreements."   [Rec. Doc. 861, pp. 24-25, 31].

Finally, Maweu confirmed his understanding of various aspects of the sentencing process:  that he was subject to a sentence of not less than 20 years and as much as life, which penalties were set forth in documents provided to him by Kenyan authorities;  that sentencing was solely in the discretion of the district court;  that sentencing would follow the issuance of a pre-sentence investigation report, to which he would have the right to object; and that he would have no right to withdraw his plea just because he was unhappy with his sentence.  [Rec. Doc. 861, pp. 25-26, 32-37].

### *The Pre-Sentence Investigation Report and Sentencing*

On June 24, 2015, a revised Pre-Sentence Investigation Report (PSR) issued.   Using the November 1, 2014 version of the guidelines, the PSR calculated a statutorily restricted advisory range of 240-293 months imprisonment.  Maweu faced a statutory minimum penalty of 20 years and a maximum penalty of life in prison.  [PSR, ¶ 56].  Among the factual statements included in the PSR were some related to the defendant's molestation of children in Kenya, and his activities related to the production and sale of child pornography on his "My African Girls" website.[6]  [PSR at ¶¶ 17, 18].

---

[6] This information was not included in the original version of the PSR.  In response to the United States' objection that it should have been, the probation officer agreed to amend the report.  [Rec. Doc. 833, p.1].  At the sentencing hearing, defense counsel stated on the record that the defendant did not object to including these facts in the report.  [Rec. Doc. 862, p. 5].

The defendant filed two objections to the PSR, one concerning how he had achieved "SVIP." status, and one concerning his poor vision. He did not object to the PSR's inclusion of the information regarding his molestation of children in Kenya.  [Rec. Doc. 833, pp. 1-2].  Both parties filed sentencing memoranda prior to sentencing; the defendant requested a sentence within the advisory range, and the United States requested an upward deviation to a sentence of life in prison.  [Rec. Doc. 832, pp. 1-2; Rec., Doc. 831, p. 7].

On September 28, 2015, this Court conducted a sentencing hearing. After listening to arguments from counsel and providing a detailed statement of reasons tied to the factors set forth in 18 U.S.C. § 3553(a), this Court sentenced Maweu to life in prison, an upward deviation from the high end of the advisory range, to be followed by a lifetime term of supervised release. [Rec. Doc. 838, 862, pp. 6-17].

Judgment was entered on October 1, 2015, and on October 5, 2015, the defendant filed a timely *pro se* notice of appeal.  [Rec. Doc. 839].  In his direct appeal in the Fifth Circuit, the defendant challenged only his life sentence, asserting the upward deviation was substantively unreasonable and constitutionally excessive.  On August 18, 2016, the Fifth Circuit affirmed his sentence in all respects.  [Rec. Doc. 869].

On September 8, 2016, the clerk of court filed into the record a letter from Maweu that that office construed as a § 2255 motion.[7]  [Rec. Doc. 870]. On September 22, 2016, the clerk of court filed into the record what that office construed as a memorandum in support of a § 2255 motion; that filing consisted of a completed Form AO 243, the pre-printed form for § 2255 motions.  [Rec. Doc. 872].  Though Maweu attached to that form selected articles from a treaty, he did not attach other supporting documents, such as affidavits from third parties, or documents related to his extradition from Kenya.  The only relief requested by Maweu in his motion was re-sentencing "within the recommended 20-25 years, with credit for time served."  He did not request an evidentiary hearing on his motion.  [Rec. Doc. 872, p. 12].

On September 13, 2016, this Court ordered the United States to respond to Maweu's § 2255 motion.  [Rec. Doc. 871].   On September 23, 2016, the clerk filed into the record a letter received from Maweu in which he clarified that his motion "is to correct a sentence and not to vacate or set aside."  [Rec. Doc. 874].

## III.

## LAW AND ARGUMENT

Though framed as three grounds, Maweu essentially advances two claims in his § 2255 motion:

---

[7] The letter was directed to the attention of the "Publec *[sic]* Defender" and outlines arguments Maweu wanted to advance in his collateral attack.  [Rec. Doc. 870].

1.     That evidence of alleged Kenyan child molestation activities was concealed from him by the prosecutor and unspecified "interested parties" until after he had signed his plea agreement, which affected both the validity of the plea agreement and his decision not to contest extradition proceedings in Kenya (Maweu's Grounds #1 and #2); and

2.     That district court counsel rendered ineffective assistance when he failed to advise the defendant that the district court intended to deviate upwardly from the advisory range at sentencing (Maweu's Ground #3).

As to his claims regarding whether his plea was informed and voluntary, Maweu has failed to establish cause for his procedural default and actual prejudice resulting from any error.  As to his ineffective assistance of counsel claim, he has failed to satisfy the applicable *Strickland* standard.  Finally, because his allegations are speculative and unsupported by reliable evidence, his motion should be denied without an evidentiary hearing.

**A. THE CLAIMS REGARDING WHETHER HIS PLEA WAS INFORMED AND VOLUNTARY COULD HAVE BEEN RAISED ON DIRECT APPEAL BUT WERE NOT, AND MAWEU HAS FAILED TO SHOW CAUSE FOR THAT PROCEDURAL DEFAULT, DEMONSTRATE ACTUAL PREJUDICE RESULTING FROM ANY ERROR, OR ASSERT "ACTUAL INNOCENCE." ALTERNATIVELY, EVEN IF NOT PROCEDURALLY BARRED, THESE CLAIMS ARE WITHOUT MERIT.**

At the outset, it is important to note that while the defendant has twice asserted—in the § 2255 motion itself and in his September 23, 2016, letter of clarification—that he seeks only the correction of his above-guidelines *sentence*, the nature of claims asserted in Grounds #1 and #2 address the validity of his underlying *conviction*. [Rec. Doc. 872, pp. 4-5, 12; Rec. Doc. 874]. If, as he claims, his plea was defective because it was uninformed, then the relief requested—maintaining his conviction (and any perceived benefits of his plea bargain) while obtaining a reduction in his sentence—is unavailable. *Cf. Fooshee v. United States*, 203 F.2d 247, 248 (5th Cir. 1953) (rejecting a defendant's attempt to use Federal Rule of Criminal 35, which "affords a procedure for bringing an improper sentence into conformity with the law," to challenge the validity of the underlying conviction; a rule governing correction of an illegal sentence "presupposes a valid conviction"). Nonetheless, because "pro se

pleading[s] must be treated liberally as seeking the proper remedy," *United States v. Robinson*, 78 F.3d 172, 174 (5th Cir. 1996), the United States addresses these claims as if properly presented.

### 1. The defendant has not demonstrated that ineffective assistance of counsel "caused" his default.

As the Fifth Circuit has recognized, "a collateral challenge may not do service for an appeal." *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (en banc).  So, to insure that habeas proceedings do not develop into a substitute for direct appeal, the U.S. Supreme Court has created a so-called "procedural bar."  Thus, "[w]here the petitioner—whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice . . . .'" *Reed v. Farley*, 512 U.S. 339, 354 (1994).  This is a significantly higher hurdle than the "plain error" standard applicable on direct appeal.  *United States v. Frady*, 456 U.S. 152, 166 (1982).  "A federal habeas petitioner who is unable to make the requisite showing of cause and prejudice can obtain habeas relief if he can show that application of the procedural bar would constitute a miscarriage of justice—that he is actually innocent of the crime." *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003).

Though framed with reference to his extradition proceedings in Kenya, the arguments advanced in Maweu's first assignment of error (designated by

him as Grounds #1 and #2) concern the validity of his guilty plea in U.S. District Court.   By arguing he was misled regarding the conduct to be adjudicated as a result of his plea agreement, he essentially attacks whether his plea was knowing and voluntary.   While such an argument is generally cognizable in a § 2255 petition, *Taylor v. Whitley*, 933 F.2d 325, 327 (5th Cir. 1991), the defendant must nonetheless overcome the procedural bar.   *See United States v. Guerra*, 94 F.3d 989, 992-93 (5th Cir. 1996) (applying the procedural bar to a § 2255 motion alleging a guilty plea was invalid because the defendant was not properly advised of the applicable penalties); *see also, United States v. Suddeth*, 1994 WL 286157, *1 (5th Cir. June 14, 1994) (in a § 2255 proceeding addressing the defendant's claim that his plea was involuntary due to a breach of the plea agreement, recognizing that the claim "is cognizable in collateral review only if Suddeth could show cause for his procedural default and actual prejudice resulting from the error").

First, Maweu has not established "cause" for his failure to raise a claim regarding the invalidity of his plea on direct appeal.   The "cause" standard requires Maweu to show that "some objective factor external to the defense" prevented him from raising on direct appeal the claim he now advances. *Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992), *quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).   Objective factors that constitute "cause" include interference by officials that makes compliance with the procedural

rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel on the prior occasion, and constitutionally ineffective assistance of counsel. *Id.*

Maweu asserts he could not have raised on direct appeal his claims regarding whether his guilty plea was fully informed because "the treaty was not brought up at sentencing" by defense counsel. [Rec. Doc. 872, pp. 4-5]. Thus, Maweu apparently attempts to satisfy the cause standard by establishing district court counsel rendered constitutionally ineffective assistance when he failed to address at sentencing the Kenyan extradition proceedings.[8]

Ineffective assistance of counsel claims are governed by the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on an ineffective assistance claim under the *Strickland* standard, a petitioner must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Id.* at 687. In establishing deficient performance, the defendant must demonstrate that counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

---

[8] As discussed in greater detail below, Maweu does not include this assertion in his assignment of error addressing ineffective assistance of counsel. That assignment of error is based exclusively on whether defense counsel advised him that the district court intended to depart or deviate from the advisory range at sentencing. [Rec. Doc. 872, p. 6].

However, because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable[,]" and in light of the difficulties inherent in making the evaluation, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id*. at 689 (internal citations and quotation marks omitted). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011).

With regard to the prejudice prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome," but "whether it is 'reasonably likely' the result would have been different." *Id*. at 111.

First, Maweu fails to establish how counsel's failure to develop a record in the district court regarding his extradition proceedings impaired his ability to challenge on appeal the voluntariness of his plea. That Maweu was brought to the United States via foreign extradition—as opposed to having been arrested somewhere in the United States, for example—is a red herring in this

context.   By his own admission in his motion, Maweu signed the plea agreement while in custody in the United States awaiting trial on the instant charges.  [Rec. Doc. 872, p. 5].  To that extent, he is no different from any other criminal defendant who decides to plead guilty based on his understanding of what facts might be used to enhance his sentence.  Even without information in the record regarding his extradition proceedings, he still could have argued on direct appeal that his plea was uninformed because he was unaware the prosecution might offer evidence of uncharged criminal conduct, and/or that the district court might consider that conduct at sentencing.  The nature of the proceedings that brought him to the United States to face the charges in the Indictment had no bearing on his understanding of the plea bargain into which he ultimately entered.

Because the extradition proceedings were thus irrelevant as to Maweu's sentence, Maweu's counsel could not have performed deficiently by failing to raise those proceedings in the context of sentencing.  *See generally*, *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (defense counsel does not render ineffective assistance when he fails to pursue frivolous, futile, or non-meritorious motions or objections).

But further, Maweu also cannot rely on ineffective counsel in excusing his default because he cannot establish prejudice in the *Strickland* sense.  As discussed above, any information regarding his extradition proceedings would

have been superfluous to his argument that his *plea* was uninformed.   As the presentation of irrelevant material could have no effect on the outcome of the proceeding, he cannot establish the second prong of the *Strickland* test.  *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (holding that because there would have been "nothing to gain" from defense counsel offering certain evidence, the defendant could not establish prejudice under *Strickland*).  And having failed to establish ineffective assistance of counsel, Maweu cannot rely on such an argument to establish "cause" for his procedural default.

### 2.   *Even if Maweu can establish "cause" for failing to raise the issue on direct appeal, he cannot establish prejudice from any error, thus he is not entitled to relief.*

Even if Maweu can establish his failure to raise the issue regarding the voluntariness of his plea on direct appeal was due to counsel's failure to develop a district court record the issue, he still is not entitled to relief under § 2255. This is because he cannot establish that absent the alleged "concealment" of information regarding the molestation of the Kenyan girls, he would not have entered a guilty plea. *See generally, Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (holding, in the context of a § 2255 motion alleging ineffective assistance of counsel with respect to the entry of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that . . . he would not have pleaded guilty and would have insisted on going to trial").

Most significantly, Maweu does not contend in his § 2255 petition that any error—whether on the part of the court, the prosecution, or his counsel—in failing to advise him regarding the prosecution's possession of the Kenyan molestation evidence affected his decision to plead guilty.  Indeed, in his letter to the clerk sent after his § 2255 petition was filed, he asserted that he was not seeking to vacate or set aside his *conviction*, but merely to correct his sentence. [Rec. Doc. 874].

Further, the record supports a finding that Maweu was fully advised, during the plea colloquy itself, regarding sentencing options and procedure.  In response to specific admonishments from the district judge, Maweu confirmed his understanding of the fact that he was subject to a sentence of not less than 20 years and as much as life, which penalties he admitted were set forth in documents provided to him by Kenyan authorities;  that sentencing was solely in the discretion of the district court; that sentencing would follow the issuance of a pre-sentence investigation report, to which he would have the right to object; and that he would have no right to withdraw his plea just because he was unhappy with his sentence.  [Rec. Doc. 861, pp. 25-26, 32-37].

That Maweu never objected to the information about the Kenyan girls when it was included in the PSR; that he did not move to vacate his guilty plea after he saw the information had been included in the PSR and the government's sentencing memorandum; and that he did not challenge on direct

appeal the district court's consideration of that evidence all weigh against a finding prejudice.[9]   *See e.g., United States v. Batamula*, 823 F.3d 237, 241 (5th Cir.), *cert. denied*, ___ S.Ct. ___, 2016 WL 4127263 (Oct. 3, 2016) (in affirming the district court's denial of a § 2255 motion asserting the defendant's guilty plea was uninformed because he was not advised of the immigration consequences of his conviction, relying in part on the fact that Batamula had never attempted to withdraw his guilty plea, which was relevant to whether he was prejudiced by any error); *United States v. Kayode*, 777 F.3d 719, 725 (5th Cir. 2014) (noting that in assessing prejudice from counsel's failure to advise the defendant of the consequences of his guilty plea, a relevant factor is "[the defendant's] representations about his desire to retract his plea"); *see also, United States v. Rodriguez-Losoya*, 584 F. App'x 186, 188 (5th Cir. 2015) (in the context of a direct appeal, addressing whether the defendant had demonstrated prejudice resulting from the district court's failure to properly advise him of his sentencing exposure, and relying on the fact that the defendant had "fail[ed] to take issue with his potential sentence once he had been properly advised in the PSR").

---

[9] Maweu asserts in his § 2255 motion that he was "acquitted" of the molestation charges in Kenya and references his PSR in support of that assertion.  [Rec. Doc. 872, p. 4].  The PSR reflects that *child pornography* charges in Kenya, for which the defendant was arrested on August 12, 2010, were "dropped."  [PSR, ¶ 41].  The PSR makes no mention of an *acquittal* on any charges.

Further, it is undisputed that the offense for which Maweu was extradited, engaging in a child exploitation enterprise, is the only criminal offense for which he was charged and convicted in the United States.[10]   [Gov. Exh. 1, 2].   The evidence he contends was not disclosed to him prior to extradition—information concerning his sexual molestation of the Kenyan girls—did not constitute proof of an element of the offense of conviction. Engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g), does not have as an element a requirement that the defendant commit a contact sex offense against a child.  *See* 18 U.S.C. § 2252A(g); *United States v. Daniels*, 653 F.3d 399, 411 (6th Cir. 2011) (discussing the elements of the offense).

Similarly, that conduct did not increase his advisory range.  Maweu's base offense level of 35, dictated by U.S.S.G. § 2G2.6(a), was enhanced on two grounds only, neither of which was related to his molestation of the Kenyan girls.  Maweu received a four-level enhancement because the images posted on

---

[10] This is also confirmed by Maweu's extradition documents, which reflect: (1) extradition was sought on the basis of the charges included in the instant federal indictment; (2) the extradition request advised Maweu of the charges, the elements of the offense, and the evidence supporting the charges; (3) the instant U.S. charges were distinct from those brought against Maweu in Kenya arising out of child pornography violations that were "wholly separate"; (4) evidence generated in the investigation of Maweu reflected a connection between his "My African Girls" website and Dreamboard (referred to in the documents as "Bulletin Board A"); (5) evidence generated in the investigation indicated that Maweu had "personally produced and sold" the child pornography videos on the "My African Girls" website; (6) Maweu waived his right to contest extradition under oath; and (7) at the time he waived extradition, he "understood the consequences of such waiver."  Gov. Exh. 1, Ibrahim Affidavit, pp. 3-7, 14-18; Gov. Exh. 2 (Kenyan Order), pp. 1-2.

Dreamboard depicted children between the ages of 6 and 12 (U.S.S.G. § 2G2.6(b)(1)(A)), and a two-level enhancement because the use of Internet services facilitated the offense (U.S.S.G. § 2G2.6(b)(4)).  [PSR at ¶¶ 25, 26].

Thus, even assuming, as Maweu asserts, that information later included in his PSR and relied upon at sentencing was not disclosed to him at the time he agreed to plead guilty, and that the failure to disclose it to him was error, he cannot demonstrate that he would have otherwise elected to go to trial. Because Maweu can show neither cause for his procedural default nor "actual prejudice" arising from the error, his § 2255 motion is procedurally barred.

Finally, as the defendant does not assert "actual innocence" as to the conduct for which he was convicted, he cannot overcome that procedural bar. *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir.1999) ("[T]he fundamental miscarriage of justice exception is confined to cases of actual innocence, where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.").  As set forth in detail above, Maweu freely admitted his guilt in connection with the entry of his guilty plea and never objected to the factual findings in the PSR that detailed his criminal conduct.  He does not repudiate those admissions or factual findings now; he is not entitled to collateral relief.

### 3. Alternatively, even if these claims are not procedurally barred, they are without merit, as the evidence concerning the Kenyan molestation allegations was disclosed to Maweu well in advance of his guilty plea, and as items from defense counsel's file confirm Maweu's decision to waive extradition was unrelated to U.S. investigators' awareness of that conduct.

Even if these claims are not procedurally barred, they are without merit, as items from defense counsel's file confirm that evidence concerning the Kenyan molestation activity was disclosed to Maweu through counsel well before he pleaded guilty.[11] And to the extent Maweu's extradition proceedings are relevant at all, items in the file further confirm that his decision to consent to extradition was unrelated to U.S. agents' awareness of his Kenyan activities.

First, defense counsel's file confirms that evidence related to Maweu's "My African Girls" website was disclosed to him through defense counsel along with all other discovery materials. Counsel's file includes an October 10, 2014, letter to him from AUSA Luke Walker, lead prosecutor, addressing the disclosure of discoverable materials to the defense following the defendant's appearance in this district.[12] [Gov. Exh. 3]. Referenced in that letter and

---

[11] Maweu's district court counsel, Mr. John F. Stroud, III, died on September 4, 2016. After learning of his passing, the United States sought and obtained a court order permitting it to review relevant portions of Mr. Stroud's file. After *in camera* review by the magistrate judge, the entire file was turned over to undersigned government counsel. Relevant documents are attached to this response and referred to using the designation "Gov. Exh. ___."

[12] Maweu made his initial appearance in this district on September 29, 2014. [Rec. Doc. 808].

included in defense counsel's file were a series of DVDs, including one marked "Maweu Discovery."  Appearing on that DVD, in a folder labeled with the acronym "MAG," was a report from the U.S. Postal Inspection Service entitled, "My African Girls Forum" that detailed the results of a Postal Inspection Service investigation into that activity.  [Gov. Exh. 4].  Defense counsel's file also includes hard copies of other documents concerning the "My African Girls" website, including email messages documenting some overlap between that website and Dreamboard.[13]  [Gov. Exh. 5, 6].

Correspondence between Maweu and defense counsel prior to the defendant's entry of his guilty plea on April 9, 2015, similarly confirms that Maweu was aware of the prosecutor's knowledge of his Kenyan activities.  In a letter from Maweu to defense counsel dated March 3, 2015, Maweu referenced "prior debriefing sessions," advised counsel that he felt "intimidated" by "threats of life sentence [sic] . . .," and stated, "the way things are going," he wanted to plead "not guilty" to all charges.[14]  Later in that letter, he referenced the "My African Girls" website, asserting that the website "was

_____

[13] The first page of these additional materials has a handwritten notation at the bottom, apparently in defense counsel's handwriting, suggesting they were received on October 24, 2014.

[14] Mr. Stroud's CJA voucher reflects he attended two "conferences" involving an AUSA, Maweu, and an investigative agent prior to the time Maweu sent this letter.  Those took place on October 24, 2014, and January 13, 2015.  [Gov. Exh. 8].

given to Kenyan law enforcement by the same U.S. law enforcement . . . and which lead to the arrest and trial I was eventually acquitted from." [Gov. Exh. 7]. In spite of his knowledge that the prosecution team possessed this evidence, Maweu never suggested to counsel in early correspondence that he wanted to object to the voluntariness of his extradition waiver.[15]   [Gov. Exh. 18, 19, 20, 21].

Counsel's file reflects that in spite of any initial misgivings, however, by March of 2015, Maweu, was moving towards entry of a guilty plea. Defense counsel's CJA voucher indicates that counsel met in person with Maweu on March 6, 2015, and March 19, 2015. [Gov. Exh. 8]. The voucher entry regarding the March 19th conference suggests the purpose of the meeting was to discuss a guilty plea. [Gov. Exh. 8]. Another in-person meeting between counsel and Maweu followed on March 20, 2015. [Gov. Exh. 8]. The plea agreement reflects Maweu signed the agreement that day, and a fax transmittal page in defense counsel's file confirms that the signed agreement was faxed to government counsel that same day as well. [Rec. Doc. 824, p. 7; Gov. Exh. 11].

---

[15] Letters from Maweu to defense counsel dated December 1, 2014; December 17, 2014; January 16, 2014; and January 30, 2014, detail the defenses Maweu wanted counsel to consider or explore. In none of those letters did Maweu suggest that he was misled at the time he consented to extradition. [Gov. Exh. 18, 19, 20, 21]. The closest he comes is in his January 16, 2015 letter, in which he proposed a guilty plea to Count 3 of the Indictment based on his theory that the conduct charged in Counts 1 and 2 was outside the scope of the Extradition Treaty. [Gov. Exh. 20].

On March 26, 2015, defense counsel received a letter from Maweu in which the defendant addressed "things . . . to say during sentencing so the Judge can give not more than 20 years."  [Gov. Exh. 9].  One of the arguments in mitigation Maweu outlined in that letter was the fact that he had "waived his right to contest this extradition in order to settle this matter with the USA," and that he had previously been tried in Kenya for "related offenses" where "the evidence was the same as that you showed me concerning my African girls and acquitted [sic]."  [Gov. Exh. 9].

However, in a letter dated April 4, 2015 (apparently received by counsel on April 7, 2015 according to a handwritten notation at the bottom), Maweu expressed a change of heart, asserting that he wanted to "withdraw [his] plea of guilty," because "to enter a plea of that amount of time would be a life sentence for a man of [his] age."  [Gov. Exh. 10].  As Maweu had signed his plea agreement but not yet formally entered his guilty plea, that statement likely reflected a misunderstanding that he was already bound by the agreement. Defense counsel's CJA voucher reflects another in-person conference with Maweu on April 8, 2014.   [Gov. Exh. 8].  The next day, Maweu entered his guilty plea without expressing any confusion or consternation regarding a possible sentence.  *See* discussion infra at pp. 6-8 (addressing the district court's colloquy during the guilty plea).

26

The PSR issued on May 27, 2015.  [Rec. Doc. 833, p. 1].  Defense counsel's file includes a letter dated June 9, 2015, in which he raised two minor objections to the PSR, neither of which affected the calculation of the advisory range.  [Gov. Exh. 13].

On June 18, 2015, AUSA Walker sent a letter to the probation officer summarizing his objections to the PSR.  In it, he urged her to amend the PSR to include information regarding Maweu's molestation of Kenyan children through his involvement in the "My African Girls" website.  A copy of that letter appears in defense counsel's file.  [Gov. Exh. 12].  Defense counsel's CJA voucher reflects that he spent time on June 18, 2015 reviewing that letter, and that on June 23, 2015, he had an in-person conference with Maweu "re: sentencing."  [Gov. Exh. 8].  The PSR was amended the next day, June 24, 2015; a copy of the amended PSR was provided to defense counsel by fax that same day.  [Gov. Exh. 22].

Defense counsel's file reflects that on August 13, 2015, Maweu sent defense counsel a letter inquiring whether "the PSR has been amended" and requesting a copy before sentencing.  A handwritten notation at the bottom of the letter in counsel's file suggests he received it on August 19, 2015.  [Gov. Exh. 14].  Defense counsel's CJA voucher indicates that he reviewed that letter on August 19, 2015, and that he had an in-person conference with Maweu a

week later, on August 26, 2015.  [Gov. Exh. 8].  No further objections to the PSR were ever filed.

In a September 8, 2015 letter, defense counsel advised Maweu that his sentencing had been re-set to September 28, 2015, due to government counsel's unavailability on the original date.  [Gov. Exh. 15].  On September 11, 2015, the United States filed its sentencing memorandum, which included a discussion of the Kenyan molestation activity.  [Rec. Doc. 831, 831-1, 831-2]. On September 15, 2015, defense counsel filed the defendant's sentencing memorandum.  That memorandum did not specifically address or refute the information regarding the Kenyan molestations; it did, however, urge the court to consider in mitigation of sentence the fact that the defendant had consented to extradition.  [Rec. Doc. 832].

On September 19, 2015, Maweu sent defense counsel a final letter.  In it, he expressed suspicion regarding the re-setting of his sentencing date and the prosecutor's actions in urging the probation officer to include in the PSR information regarding the Kenyan molestation activity.[16]  He suggested these events were part of the prosecutor's plan to pressure him into cooperating.

---

[16] On June 18, 2015, the sentencing hearing was moved from July 14, 2015 to September 3, 2015; on August 28, 2015, it was moved again to September 28, 2015.  Both dates were rescheduled at the request of the United States, though without objection from defense counsel. [Rec. Doc. 829, 830].  In his letter to Maweu, defense counsel stated that the last continuance of the sentencing date was required because government counsel "had a trial that took longer than originally planned."  [Gov. Exh. 15].

Maweu emphasized he "[had] no intention of cooperating any more that [he had] done already," both because he did not trust the prosecutor, and because he had "stopped dwelling on this matter back in 2010 and moved on."  Maweu further suggested that the laws under which he had been convicted "constitute[d] an abuse of [the United States'] superpower status," and that he had likely been prosecuted because "Louisiana is a poor state and its economy depends on agriculture and prisons."  He concluded by noting that he was prepared to serve whatever sentence was imposed, as the United States had "destroyed everything [he] ever had in Kenya," and he had "nothing to loose [sic]."  [Gov. Exh. 16].

Maweu was sentenced on September 28, 2015.  During the sentencing hearing, the court expressly referenced Maweu's Kenyan molestation activity, including his "My African Girls" website and his creation of "the Goldberg series," and relied on that conduct in part in deviating upwardly from the advisory range.  [Rec. Doc. 862, pp. 9-10, 11-12, 14].  At no point did Maweu object to the court's consideration of that evidence; in fact, Maweu did not object to his sentence on any grounds.[17]

---

[17] Maweu declined the court's invitation to personally speak at sentencing.  [Rec. Doc. 862, p. 6].  Mr. Stroud's file includes a typed document titled "Allocution" written in the first person that, though undated, is consistent with a statement prepared in connection with sentencing.  It does not appear in the record, however, so it was apparently never submitted to the court.  Much of the statement is devoted to minimizing Maweu's conduct by asserting that what he did was legal under Kenyan law.  [Gov. Exh. 17].

The items in defense counsel's file, considered in the context of the events in this case that precipitated their creation, reasonably support the following factual inferences:   that Maweu's decision to consent to extradition was motivated by an attempt to obtain more favorable treatment on the U.S. charges and was unrelated to whether the United States possessed the Kenyan molestation evidence; that evidence regarding Maweu's Kenyan molestation activities was disclosed to him along with other discoverable materials provided to counsel shortly after his initial appearance in the United States on the instant charges, thus he was aware of it well before he pleaded guilty; that although he suggested numerous other potential defenses, he never urged defense counsel to raise any aspect of his extradition proceedings as a defense to the charges; that he was aware the Kenyan molestation evidence was included in the revised PSR and later relied upon by the court at sentencing, but he made no effort to object to it before, during, or after sentencing; and, though he raised other complaints about the proceedings, he never suggested to counsel that he wanted to withdraw his guilty plea on the ground that he was unaware the government would rely upon the Kenyan molestation evidence at sentencing.

Maweu, displeased with his life sentence, now seeks its reduction by challenging the validity of his underlying conviction.  Even assuming he can obtain relief solely from his sentence by attacking his underlying conviction,

*see* discussion *infra* at pp. 12-13, he assertions that he was misled into consenting to extradition and pleading guilty are refuted by the only documents in the record.   Even if his claims are not procedurally defaulted, they are without merit, and his § 2255 motion should be denied on Grounds #1 and #2.

### B.   THE DEFENDANT IS NOT ENTITLED TO RELIEF ON HIS CLAIM THAT COUNSEL WAS INEFFECTIVE IN ADVISING HIM REGARDING THE DISTRICT COURT'S INTENT TO DEVIATE FROM THE ADVISORY GUIDELINE RANGE, AS HE CANNOT SATISFY EITHER PRONG OF THE *STRICKLAND* STANDARD.

In his third ground in his § 2255 petition, Maweu asserts that counsel rendered ineffective assistance when he failed to advise him of the district court's intent to depart or deviate from the advisory guideline range and impose a sentence consistent with the factors set forth in 18 U.S.C. § 3553(a). Specifically, he contends this failure left him unprepared to refute the grounds for departure or deviation.  [Rec. Doc. 872, p. 6].   As discussed above, under the two-prong test the Supreme Court set forth in *Strickland*, a petitioner alleging ineffective assistance of counsel must show: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different.  *See* discussion *infra* at pp. 15-16.   Maweu is not entitled to relief, as he cannot meet either prong of the

31

*Strickland* standard.  *Strickland* 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 1.   Counsel's performance did not fall below an objective standard of reasonableness.

"The Constitution requires that a defendant be advised and understand the consequences of a guilty plea," which, with respect to sentencing, "means only that the defendant must know the maximum prison term and fine for the offense charged." *United States v. Rivera*, 898 F.2d 442, 447 (5th Cir. 1990). Thus, "as long as the [defendant] understood the length of time he might possibly receive, he was fully aware of his plea's consequences." *Id.* (citations and internal quotation marks omitted).

With regard to counsel's advice regarding the sentencing guidelines, the Fifth Circuit has recognized that the guidelines "do not provide for 'mandatory minimum penalties depending on the level of the offense'; instead, "the sentencing ranges specified in the guidelines are designed to provide a structure for case analysis so as to minimize disparate sentencing on like facts." *Id.* Accordingly, "the inability of [defense] counsel to correctly predict the sentence does not constitute ineffective assistance of counsel." *Id.*; *see also*, *United States v. Bazan*, 1995 WL 798424 (5th Cir. Dec. 12, 1995) (citing *Rivera*

for the proposition that "an attorney's incorrect prediction of the application of Sentencing Guidelines does not constitute ineffective assistance of counsel").

Though defense counsel's CJA voucher confirms various conferences by telephone and in person with the probation officer and Maweu in connection with the preparation and amendment of the PSR, nothing in counsel's file suggests what he might have told Maweu regarding operation of the sentencing guidelines, or the likelihood the court would deviate from the advisory range.  [Gov. Exh. 8].  First, the content of counsel's advice in that regard is largely irrelevant in light of the authorities set forth above, as he was not constitutionally required to provide an accurate prediction as to Maweu's final sentence.  *Rivera*, 898 F.2d at 447.

But even assuming, as Maweu complains, that his counsel failed to advise him prior to sentencing of the district court's "intent" to deviate, [Rec. Doc. 872, p. 6], that claim is without merit.  As the Supreme Court has recognized, the district court has no obligation to provide advance notice to the parties of an intent to deviate from the advisory range pursuant to its post-*Booker* authority.  *Irizarry v. United States*, 553 U.S. 708, 716 (2008). Obviously, counsel could not pass on to the defendant what he himself had not been told.  Maweu cannot establish that defense counsel's performance was deficient under *Strickland's* first prong.

### 2.  *Even if counsel erred, the defendant cannot demonstrate prejudice.*

But even assuming for purposes of argument that counsel gave Maweu poor advice regarding the operation of the guidelines in his case, Maweu has not established how that error affected the outcome of the proceedings by producing a harsher sentence.  *United States v. Stewart*, 207 F.3d 750, 751 (5th Cir. 2000) ("In the context of sentencing, prejudice means that but for his counsel's error, his sentence would have been significantly less harsh.").

Maweu was thoroughly advised, both by the district court and his plea-related paperwork, regarding the uncertainties of federal sentencing, and the record reflects he acknowledged his understanding of those uncertainties. First, Maweu's plea agreement advised him of the minimum and maximum statutory penalties.  Further, the agreement alerted him that the case was

> governed by the Sentencing Reform Act, as modified by *United States v. Booker*, 543 U.S. 220 (2005), that the defendant has discussed the Sentencing Guidelines and their applicability with his counsel, and he understands and acknowledges that a final determination of the applicable guidelines ranges cannot be made until the completion of the pre-sentence investigation[.]

[Rec. Doc. 824, pp. 2, 3].

During his plea colloquy, the district court emphasized that while it did not yet know what Maweu's sentence would be, "it could range between 20 years up to a lifetime in prison."  Maweu confirmed he was aware of that

34

penalty, noting it had been explained to him by Kenyan authorities in connection with extradition, and it was in the documents given to him by those authorities.   [Rec. Doc. 861, pp. 25-26; Gov. Exh. 1].  The district court also explained the benefits the defendant might receive if the government elected to file a § 5K1.1 or a § 3553(e) motion, emphasizing the practical difference with regard to the statutory minimum.  [Rec. Doc, 861, pp. 29-30].

With specific regard to the sentencing guidelines and the pre-sentence investigation process, Maweu confirmed that he and his counsel had discussed the effect of the sentencing guidelines on his case; the court observed it had surmised as much from Maweu's earlier remark that the low end of the guidelines was below the statutory minimum.  [Rec. Doc. 861, pp. 25, 31]. When the district court asked Maweu if his attorney had made "a prediction or a prophecy or even a promise to [him] as to what [his] sentence [would] be," Maweu replied that counsel had "told [him] that it's entirely to [the court's] discretion."  The judge emphasized that he was "the only one in this courtroom having the authority to sentence [Maweu]"; Maweu confirmed he understood. [Rec. Doc. 861, pp. 32-33].

Next, the district court explained that it would order the preparation of PSR, which would "tell [the court] everything about [Maweu's] social history from birth forward, right up to the current time."  Referring to a copy of the sentencing table, the court explained the operation of the guidelines, including

the calculation of both the offense level and the criminal history category.  The court emphasized that the report would address "this crime" as well as "any other crimes [he] had been convicted of" and "other activities, called relevant conduct," that the court would consider in determining a reasonable sentence. Maweu expressed his understanding of these concepts.  [Rec. Doc. 861, p. 33].

The court then explained that the guidelines were no longer mandatory, and that it could impose a sentence outside the range "based on what are called Section 3553(a) factors," thus producing "a non-Guidelines sentence."  The court emphasized that Maweu's attorney would receive a copy of the PSR, that he would have an opportunity to object to it, and that the court would ultimately rule on any objections that could not be resolved by the parties. [Rec. Doc. 861, p. 35].

Finally, the court noted that it did not know, at that time, "what [Maweu's] sentence [would] be," including whether his sentence would fall within the guidelines.  The court emphasized, however, that in the event Maweu's sentence was harsher than he expected, he would have the right to appeal it, but he would have "no legal right to withdraw [his] guilty plea . . . ." Maweu acknowledged his understanding of all of these principles.  [Rec. Doc. 861, p. 36].

This colloquy confirms that Maweu was thoroughly advised by the Court, in connection with the entry of his guilty plea, regarding the nature of the PSR and the topics it would address; the operation of the sentencing guidelines; the advisory nature of the guidelines; and the Court's authority to sentence him above the advisory range.  He repeatedly acknowledged, under oath, his understanding of all of these concepts.  Maweu's "solemn declarations in open court" carry "a strong presumption of verity."  *United States v. Palmer*, 456 F.3d 484, 491 (5th Cir. 2006) (alterations and internal quotation marks omitted).

Under these circumstances, Maweu cannot establish how counsel's failure to advise him of the Court's authority to depart or deviate prejudiced him.  *See e.g., United States v. Castillo-Sanchez,* 1995 WL 103643, *4 (5th Cir. Mar. 3, 1995) (finding no prejudice from counsel's incorrect prediction that the defendant would receive a sentence of about 40 months, when the actual guideline range was 57-71 months; the record reflected that the defendant was advised at re-arrangement of the statutory penalty, he acknowledged he had had ample opportunity to discuss his case with counsel, and he had conceded he had not received any promises of any kind); *United States v. Bazan,* 1995 WL 798424, *3 (5th Cir. Dec. 12, 1995) (finding no prejudice from counsel's alleged failure to advise the defendant that he might receive a greater sentence if the PSR elected to apply the guidelines' career offender provisions; the

defendant acknowledged under oath at the time he entered his guilty plea that he was aware of the statutory penalties and the fact that no one could predict his sentence until after the PSR had issued, and he further acknowledged he had discussed with counsel the application of the guidelines to his case); *United States v. Wimby*, 1994 WL 14161, *4 (5th Cir. Jan. 6, 1994) (finding no prejudice from counsel's inaccurate prediction regarding the applicable guideline range where the defendant was advised by the district court that counsel's prediction was merely an estimate, and that there was no guarantee as to what his sentence would be).[18]

Further, to the extent Maweu suggests he would have approached sentencing differently had his counsel advised him of the district court's authority to deviate upwardly from the advisory range, the record provides no support for that assertion.  That he made no effort to challenge the inclusion of information regarding the Kenyan molestation allegations, in spite of the court's clear admonition that the range was merely advisory, confirms that any failure by counsel did not affect the outcome of the sentencing proceedings. *See generally*, *United States v. Jones*, 444 F.3d 430, 443 (5th Cir. 2006) (in the context of a direct appeal, noting that where the defendant claims for the first

---

[18] Though unpublished, these decisions of the Fifth Circuit are precedential. *See* Fifth Cir. R. 47.5.3.  (rulings of the Fifth Circuit issued before January 1, 1996 are binding precedent).

time on appeal he was denied prior notice of the district court's intent to depart from the guideline range, he must show that the outcome of the proceedings would have been different if he had been afforded notice).

An adverse effect resulting from lack of notice is particularly unlikely here, as the facts regarding the Kenyan molestation activity were but among many sentencing considerations relied upon by the court.  As the sentencing transcripts reflects, the sentence was informed by many other considerations including the defendant's "unique" position in the enterprise based on the fact that he paid the hosting fee for the Dreamboard website; the court's assessment that he was "the worst of the worst" Dreamboard offender of the 59 members the court had sentenced so far; the prepubescent age of the victims depicted in the images; the court's belief that the guideline range "[did] not capture the reprehensible conduct engaged in by this defendant over and over and over again"; and the court's desire to "send the signal[ ] to others of like-minded behavior to stop." [Rec. Doc. 862, pp. 8-13].  Particularly in light of the many, highly relevant considerations relied upon by the district court, Maweu cannot establish how any lack of notice affected the final sentence imposed. *See e.g., United States v. Smith*, 295 F. App'x 611, 613 (5th Cir. 2007) (where the court stated it thought the range suggested by the guidelines substantially understated the seriousness of this defendant's conduct, concluding it was highly unlikely the court would have imposed a lower sentence if the defendant

had notice of the intent to depart, and thus an opportunity to contest the grounds for departure).   Even if counsel performed deficiently, Maweu has not established *Strickland* prejudice.   He is not entitled to relief on Ground #3.

### C.   THE DEFENDANT'S § 2255 MOTION SHOULD BE DENIED WITHOUT AN EVIDENTIARY HEARING, AS HE HAS NOT PRESENTED "INDEPENDENT INDICIA" OF THE LIKELY MERIT OF HIS ALLEGATIONS.

A defendant is entitled to an evidentiary hearing on his § 2255 motion only if he presents "independent indicia of the likely merit of [his] allegations." *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008).   Where, as here, a defendant's allegations contradict sworn testimony given at a plea hearing, the court should typically require "specific factual allegations supported by the affidavit of a reliable third person." *United States v. Reed*, 719 F.3d 369, 373-74 (5th Cir. 2013) (citations omitted).   "[S]peculative and unsupported accusations of government wrongdoing do not entitle a defendant to an evidentiary hearing." *Id*. at 374.

Aside from his § 2255 motion, which was prepared using Form AO-243 provided by the clerk of court and executed under penalty of perjury [Rec. Doc. 872], the defendant offered only a single page from an unknown source that recites certain articles of a purported Kenyan extradition treaty.   This is so even though many of his allegations, especially those regarding lack of notice of the district court's sentencing options, are contradicted by his sworn

40

assertions during his re-arraignment.  He did not offer any official documents related to his extradition, nor did he attach affidavits from reliable third parties (e.g., witnesses to the Kenyan extradition proceedings, his Kenyan counsel, etc.).

Similarly, Maweu offers nothing more than his own unsupported allegations regarding the alleged "collusion" and "conspiracy" between the prosecutor and unnamed "other interested parties," even though that is the type of allegation that likely cannot be established by the defendant's say-so alone.  *Compare Reed*, 719 F.3d at 374 (finding that Reed's assertion in an affidavit regarding the substance of a one-on-one conversation he had with defense counsel was "sufficient to prove his allegation and was not speculative, conclusory, plainly false, or contradicted by the record," thus the district court erred in denying his motion without a hearing).

Finally, Maweu is not entitled to an evidentiary hearing on his motion because even if his assertions are true, he is not entitled to relief.  *See Pyles v. Johnson*, 136 F.3d 986, 995 n.7 (5th Cir. 1998) (refusing to remand for an evidentiary hearing to resolve a certain factual dispute raised by the defendant's habeas petition; even assuming the defendant's version of events was correct, he still would not be entitled to relief); *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997) (concluding the defendant's affidavit in support of his habeas petition did not trigger a right to an evidentiary hearing; even if

accepted as true, the affidavit did not support a finding that the prosecution violated *Brady*).

As discussed in greater detail above, it is undisputed that (1) Maweu was convicted of and sentenced for only the offense for which he was extradited; (2) the Kenyan molestation information did not establish an element of the offense and did not increase his advisory guideline range; (3) he received all the notice he was entitled to regarding the Court's sentencing options; and (4) to the extent the Kenyan molestation information was considered at sentencing, it was only one of several factors relied upon by the Court.   Thus, this Court may—and should—deny the defendant's motion in light of undisputed facts apparent on the existing record, as supplemented by the documents attached to the United States' response.

## IV.

## CONCLUSION

The defendant's § 2255 motion should be denied.

Respectfully submitted:

STEPHANIE A. FINLEY
United States Attorney

BY:   *s/ Camille A. Domingue*

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501, (337) 262-6618

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing United States' Response to Defendant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 was filed electronically with the Western District of Louisiana using the electronic filing system.  Notice of this filing will be sent via United States Mail, postage prepaid, to the *pro* se defendant as follows:

Mr. Brian Musomba Maweu (#17362-035)
USP – Pollock
P. O. Box 2099
Pollock, LA 71467.

Lafayette, Louisiana, this the <u>16th</u> day of November, 2016.

Respectfully submitted,

STEPHANIE A. FINLEY
United States Attorney

BY:   *s/ Camille A. Domingue*

CAMILLE A. DOMINGUE (#20168)
Assistant United States Attorney